IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO.   3:14-00129

KENDALL LAMAR SPEARS

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Kendall Lamar Spears's Motion to Suppress evidence seized on November 3, 2012.   Upon consideration of the arguments and the evidence, and for the following reasons, the Court **DENIES** Defendant's motion.

**I.     Facts**

On November 3, 2012, Huntington Police Department ("HPD") Detective Steve Maniskas spoke with two individuals at the HPD headquarters.   The individuals stated that their daughter had called them from Detroit, MI and informed them that she was paid $200.00 to drive an unknown man, a black male, to Detroit.   They told the detective that their daughter said her boyfriend and the man did not want her to use the phone, but she was able to sneak away and use it. The individuals said that their daughter was planning to return to Huntington, WV that evening on either Route 23 or 52, in a blue/green 1996 Dodge Caravan with a green license plate bearing her children's names.   The daughter's boyfriend, children, and the man would be travelling with her. The daughter also told them that the man would be bringing heroin with him to the Huntington area.   The individuals stated that they wanted to remain anonymous because they feared for the safety of their daughter.   The individuals provided Detective Maniskas with their phone number, their daughter's name, their daughter's address, the name of their daughter's boyfriend, and the

general location of the black male's residence. They said that the man lived near Long John Silver's restaurant on 5th Avenue in Huntington.

Agents of the Huntington Violent Crime and Drug Task Force ("Task Force") then conducted surveillance near Long John Silver's restaurant. The agents later learned that the van would be entering Huntington on Route 2 and shifted surveillance to that area. Task Force agents informed HPD Officers Richard Kern and Ron Lusk to look out for the van. At approximately 11:00 PM agents with the Task Force observed the van driving south on Route 2. Agents from the Task Force informed Officer Kern that the van was speeding. Officer Kern testified that he does not remember which Task Force agent initially informed him that the van was speeding. Approximately twelve minutes later, Officer Kern stopped the van. The driver was identified as Ms. Lewis, the daughter of the individuals who had spoken to Detective Maniskas at the HPD headquarters. The passengers were identified as Ms. Lewis's boyfriend, her children, and Defendant Kendall Lamar Spears.

Within one to two minutes of the initial stop, Officer Lusk arrived with a dog trained in identifying narcotics. The dog was also trained in apprehending suspects. Accordingly, the officers removed all of the occupants from the vehicle to ensure their safety while the dog was deployed on the vehicle. The dog gave a positive indication on the vehicle, signaling that it might contain narcotics. Ms. Lewis then consented to a search of the van. During the search officers seized 304 15 MG oxymorphone pills, which were concealed in the area where the defendant had been seated.

## II.     Legal Standard

The Fourth Circuit "treat[s] a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*." *United States v. Digiovanni*, 650 F.3d

498, 506 (4th Cir. 2011). Under *Terry*, traffic stops are analyzed in two steps. The first step asks whether the police officer's actions were justified at the time of their inception. *Id.* (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)); *see Terry v. Ohio*, 392 U.S. 1, 20 (1968). The second step asks whether "the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Digiovanni*, 650 F.3d at 506; *see Terry*, 392 U.S. at 20.

With regard to the first step, a police officer may make a traffic stop if the officer witnesses a traffic violation. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). He may stop "the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *Id.* Furthermore, a police officer may make a longer "investigatory" stop, or extend a routine traffic into an investigatory stop, *Branch*, 537 F.3d at 337, if the officer's action is "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity," *United States v. Cortez*, 449 U.S. 411, 417 (1981). In other words, to make an investigatory stop, police officers must have a "reasonable suspicion," *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) (citing *Terry*, 392 U.S. at 30), based on "specific and articulable facts . . . that criminal activity may be afoot," *Terry*, 392 U.S. at 21, 30.

This standard is an objective one:

> [T]he lawfulness of a *Terry* stop turns "not on the officer's actual state of mind at the time the challenged action was taken," *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S .Ct. 2778, 86 L.Ed.2d 370 (1985), but rather on "an objective assessment of the officer's actions," *Scott v. United States*, 436 U.S. 128, 137, 98 S. Ct. 1717, 56 L.Ed.2d 168 (1978). In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent.

*Branch*, 537 F.3d at 337; *see Whren v. United States*, 517 U.S. 806, 813 (1996) ("[Our previous] cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). Furthermore, the reasonable suspicion

standard requires a "holistic" approach, looking at all "of the facts and inferences produced by a police officer." *Branch*, 537 F.3d at 337. "Courts must look at the 'cumulative information available' to the officer" in evaluating whether the stop was justified. *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In *United States v. Branch*, for example, a police officer stopped a vehicle after it ran a red light. *Branch*, 537 F.3d at 332. The officer learned from the dispatcher that the vehicle had been in a previous traffic incident in an area known for drug trafficking. Inside the vehicle, the officer noticed multiple air fresheners and the odor of laundry detergent. *Id.* He also noticed that the driver, Mr. Branch, avoided making eye contact. *Id.* Upon viewing Mr. Branch's license, the officer recalled hearing his name in connection with drug offenses. *Id.* at 333. After making a call over the radio, another police officer confirmed that Mr. Branch was known to deal drugs. *Id.* A drug-sniffing dog was eventually deployed and officers searched the vehicle. *Id.* at 333–34. The Fourth Circuit held that the investigatory stop did not violate the Fourth Amendment because the officer had a reasonable suspicion, based on the observations and inferences available to him, that the vehicle contained narcotics. *Id.* at 338–40.

In addition to an officer's observations, reasonable suspicion may be based on an anonymous tip if the information provided "exhibits sufficient indicia of reliability." *United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007) (citing *Florida v. J.L.*, 529 U.S. 266, 370 (2000)). In *United States v. Elston*, the Fourth Circuit identified a number of factors useful in determining whether an anonymous tip is sufficiently reliable. *See id.* A tip is more likely to be reliable (1) if it includes substantial detail about identified individuals and alleged criminal activities, (2) if the informant explains the basis for her knowledge, (3) if that knowledge is based on "contemporaneous personal observation," and (4) if the informant provides "information that would enable authorities to identify her if they deem it necessary to do so." *Id.* at 318–19 (holding

that anonymous tip was sufficiently reliable where tipster provided significant detail about suspect's appearance, described suspect's location, and enabled police to identify her simply by finding out who suspect had been with immediately before he was detained). Furthermore, informants who provide information to the police in person are more reliable than those who make anonymous telephone calls. *See United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000).

Finally, the second step of the *Terry* analysis requires that the scope of an officer's actions during an investigatory stop "be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)). The question is whether the stop "lasted longer than was necessary, given its purpose." *Branch*, 537 F.3d at 336. If so, the issue becomes whether the delay was constitutionally significant or merely *de minimis*. As the Fourth Circuit explained in *United States v. Digiovanni*:

> [W]here a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation. *Mason*, 628 F.3d at 132; *see also Farrior*, 535 F.3d at 219–20 (holding that a minimal delay in conducting a dog-sniff caused by a police officer's inexperience was *de minimis* where there was no attempt at subterfuge or stalling on the part of the police officer) (internal quotation marks omitted).

*Digiovanni*, 650 F.3d at 509.

### III. Discussion

In his Motion and Supplement, the Defendant argues that the initial stop of the van was improper because Officer Kern did not witness the van speeding and the government did not demonstrate that the stop was "prompted by probable cause or reasonable suspicion." ECF No. 15, ECF No. 24. Under the first step in the *Terry* analysis, the initial traffic stop here may have been justified as a routine traffic stop. Officer Kerr testified that he was contacted by agents from the Task Force who observed the van speeding. Based on this information, he pulled the car over

for a traffic violation. *See id.* ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle."). It is unnecessary, however, for the Court to resolve this issue. Even if the initial stop was not a proper routine traffic stop, the stop was justified because Officer Kern had a reasonable suspicion that the van was carrying narcotics when he initiated the stop. *See Foreman*, 369 F.3d at 781 (explaining that an officer can make an investigatory stop if he has a reasonable suspicion of criminal activity). First, based on the tip from Ms. Lewis's parents, Task Force agents told Officer Kern to look out for the van. Later, Officer Kern received information from the Task Force indicating that the van was speeding. When Officer Kern saw the van, he recognized it as the vehicle described by Ms. Lewis's parents. At this point, he pulled the van over. Thus, at the time Officer Kern initially stopped the van he had information that the van was speeding and information from Ms. Lewis's parents that a van matching the one that was observed speeding was transporting illegal narcotics into Huntington. *See Branch*, 537 F.3d at 332–34, 338 (noting that officer had reasonable suspicion based on observations of defendant and vehicle, and information from other officers about vehicle's occupants).

The tip from Ms. Lewis's parents exhibited sufficient indicia of reliability to permit Officer Kern to rely on their information. The tip meets three of the four factors set out in *United States v. Elston*. *See Elston*, 479 F.3d at 318. First, Ms. Lewis's parents described the van in detail, told Detective Maniskas who would be in the van, and explained that an unknown black male was riding in the van in order to transport narcotics from Detroit to Huntington. They also told the detective when the van was expected to return to Huntington and where it might be found. *See id.* ("[A]n anonymous call is more likely to be reliable if it provides substantial detail about the individuals and the alleged criminal activity."). Second, Ms. Lewis's parents explained that their

knowledge was based on a recent phone call from their daughter, who was driving the van to Huntington. *See id.* (noting that anonymous tip is more reliable where informant discloses basis for her knowledge). Third, the parents provided Detective Maniskas with their phone number, their daughter's name, and their daughter's address, allowing the police to easily identify them if needed. *See id.* (explaining that an anonymous tip is more reliable where informant provides information that would allow police to identify her). Moreover, Ms. Lewis's parents spoke with Detective Maniskas in person, further indicating that their information was reliable. *See Christmas*, 222 F.3d at 144. Finally, when Officer Kern observed the van he was able to corroborate the description that Ms. Lewis's parents had provided. Thus, looking at the "cumulative information available" to Officer Kern, *see Branch*, 537 F.3d at 337, he had "specific and articulable facts" on which to base a reasonable suspicion that the van contained narcotics at the time he initiated the stop, *see Terry*, 392 U.S. at 21.

The Defendant emphasizes that the officer's purpose in stopping the van was not based on any reasonable suspicion that he may have had. The Defendant notes that Officer Kern "clearly stated the stop was for the traffic violation not 'reasonable suspicion' for drugs as the prior tip had indicated." ECF No. 24. Officer Kern's subjective intent, however, is immaterial. *See Whren*, 517 U.S. at 813 (explaining that constitutionality of a stop does not depend on motivation of individual officer involved). In evaluating whether he had a reasonable suspicion to conduct an investigatory stop, the Court looks objectively at all of the facts and inferences available to Officer Kern at the time he made the stop. *See Branch*, 537 F.3d at 337 (holding that courts must objectively analyze all information available to officer when stop was initiated). As explained above, there was sufficient information available to Officer Kern at the time of the stop to permit

an objectively reasonable suspicion that the van was transporting narcotics. The initial stop of the van was thus proper.

Alternatively, the Defendant argues that, even if the initial stop of the van was constitutional, "that stop was impermissibly extended to allow the probable cause to be manufactured." ECF No. 15. Under the second step of the *Terry* analysis, the Court must determine whether the van was stopped for longer than necessary to effectuate the purpose of the stop. *Branch*, 537 F.3d at 336. The van was stopped in order to investigate the allegation that it contained illegal narcotics. Officer Kern stopped the van at approximately 11:12 PM on November 3, 2012. Officer Kern testified that within one to two minutes, Officer Lusk arrived with his dog. At that point, the passengers were removed from the vehicle and the dog was deployed on the van. Once the dog made a positive indication, Ms. Lewis gave the officers consent to search the van. The officers then executed a search. Each of these steps was taken in furtherance of the officer's investigation and therefore did not unreasonably delay the stop. *See id.* (explaining that appropriate duration of a stop depends on purpose of stop). The only potential delay here occurred during the several minutes it took Officer Lusk to arrive with the dog. Such a delay cannot be considered more than *di minimis*. *See United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) ("[A]ny delay in conducting the first drug-dog sniff amounted to a *de minimis* intrusion."). Thus, the stop did not last longer than was necessary to fulfill its purpose, nor did it exceed the scope of that purpose. Accordingly, the investigatory stop did not violate the Fourth Amendment.

## Conclusion

For the above-stated reasons, Defendant's Motion to Suppress (ECF No. 15) is **DENIED.** The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and

the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals Service.

      ENTER:      September 5, 2014

      _____
      ROBERT C. CHAMBERS, CHIEF JUDGE